**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Herbert C. ENGLE, Defendant-Appellant.**

**No. 71-1816.**

United States Court of Appeals,
Sixth Circuit.

April 27, 1972.

James N. Perry (Court Appointed), Cincinnati, Ohio, for appellant.

William W. Milligan, Columbus, Ohio (Kevin M. Cuddy, Asst. U. S. Atty., Columbus, Ohio, on the brief), for appellee.

Before PHILLIPS, Chief Judge, WEICK and MILLER, Circuit Judges.

WILLIAM E. MILLER, Circuit Judge.

This is a direct appeal from appellant's 1970 conviction in the court below for the offenses of interstate transportation of property obtained by fraud, pursuant to 18 U.S.C. § 2314, "wire fraud" in violation of 18 U.S.C. § 1343, and conspiracy pursuant to 18 U.S.C. § 371. Appellant received concurrent sentences on the three charges—three years each for wire fraud and conspiracy and ten

years for interstate transportation of property obtained by fraud. The charges are based entirely on conduct occurring in 1965.

Prior to the bankruptcy of his businesses in December of 1958, the appellant Engle was an established and reputable businessman in the Cincinnati, Ohio, area. His enterprises were conducted primarily through two corporations, the King Bee Leasing Company and Nationwide Automobile Leasing Corporation. In 1958, a large number of automobiles were purchased on credit from Ohio dealers in the names of the two corporations. These automobiles were shipped to Texas and sold at auction. The proceeds of the sales were placed in corporate bank accounts in the Tyler Bank and Trust Company of Tyler, Texas. In October of 1958 Engle executed corporate checks on these accounts in order to purchase cashiers' checks. Between October 21, 1958, and October 28, 1958, Engle used the cashiers' checks to purchase government bearer bonds having a face value of approximately $450,000.00.

On December 8, 1958, Nationwide Automobile Leasing Corporation was involuntarily declared a bankrupt. Similarly, on December 26, 1958, King Bee Leasing Company was so adjudicated. Engle retained the bonds purchased in Texas rather than turn them over to the Trustee in Bankruptcy. On June 3, 1959, he was indicted under a three-count indictment (1) pursuant to 18 U.S.C. § 152 for concealing U. S. Treasury Bearer Bonds in the principal amount of $450,000 from the Trustee in Bankruptcy, (2) for the interstate transportation of these bonds pursuant to 18 U.S.C. § 2314, and (3) for mail fraud pursuant to 18 U.S.C. § 1341. A guilty plea was entered and Engle was fined a total of $25,000.00 and sentenced to three years imprisonment plus a period of probation. The assets were not relinquished to the Trustee, however, nor was their location

disclosed. The entire sentence was completed in 1965.

It was then that the alleged course of conduct which is the subject of the action before us is said to have commenced. It seems that Engle enlisted the assistance of an accomplice, Mary Elizabeth Yochum,[1] to aid him in converting the bonds to cash. Miss Yochum made use of the alias "Doris Cain" in a "scheme" which called for a series of denominational exchanges of the original bearer bonds in Detroit, Chicago and Richmond. An investigation of these transactions revealed that fruit was finally borne in Cincinnati when Miss Yochum cashed $50,000 worth of bonds which Engle had acquired by denominational exchange in Richmond.

On the basis of these activities the appellant and Miss Yochum were indicted on the present charges by a federal grand jury sitting in Cincinnati on October 29, 1965. The two were apprehended in Medford, Oregon on May 25, 1970 and trial was set for October 12, 1970.

Engle obtained as counsel the firm of Bailey, Alch and Gillis. On September 2, 1970, after an appearance by Gerald Alch, a pretrial order was filed by the district court listing this firm as counsel of record. At about this time, the appellant gave Mr. Alch two checks which were to constitute the firm's retainer fee. When these checks were not honored by the bank on which they had been drawn and instead returned marked "account closed," relations between the Bailey firm and Engle became strained. On September 29, 1970, Mr. Alch filed a motion seeking to withdraw his law firm from the case. He stated in this motion that "circumstances have arisen which so seriously deteriorated the relationship between the Defendants and Counsel that Counsel feels unable to properly exert his efforts on their behalf." Additionally, Alch sought in the same motion to have the trial continued

1. Miss Yochum was Engle's co-defendant at trial below. She was convicted along with Engle, sentenced and has completed her prison term.

to November 2, 1970, so that the Motion to withdraw would be timely under local Rule 8(e). Rule 8(e) of the United States District Court for the Southern District of Ohio states that no trial attorney shall be permitted to withdraw from an action at any time later than twenty days in advance of trial. The district court denied the motion to withdraw. Among other reasons, the district court pointed out that "the defendant Engle, through Mr. Conroy, refuses to release Alch. . . ." Noting Engle's impecunious state and sympathizing to a certain extent with Alch's position, the court below sought to arrive at an equitable arrangement. On October 14, 1970, the court found Engle to be a pauper and appointed William Bailey, an associate of the Bailey, Alch and Gillis firm to represent him, thereby ensuring that the firm would be compensated for its efforts in Engle's behalf. During the course of the trial Engle made no objection to the representation provided him by Mr. Bailey, who was successful in obtaining dismissal of one of the counts of the indictment on the ground of double jeopardy.

■■ Appealing his 1970 conviction, appellant contends that he was denied effective assistance of counsel; that he was twice placed in jeopardy for the same offense; and that there was a failure of proof as to an element essential to the establishment of each of the three counts on which he was convicted. We need not deal at length with the first and last of these assertions. While Engle now complains of the process by which the firm of Bailey, Alch and Gillis was compelled to provide representation,

it was because of his refusal to release Alch that the district court effected this rather novel arrangement. Engle knew that the firm did not wish to represent him. He cannot now complain of a situation that was largely of his own making. Furthermore, at no point during the proceeding did the appellant object to the efforts of the younger Mr. Bailey. Finally, our own review of the record indicates that Mr. Bailey represented his client loyally and ably. Thus, while the relationship between Engle and his trial counsel was less than ideal, we do not find that his constitutional rights were infringed in this regard. Engle's third assertion is no more substantial. Essentially, he asks this Court to find that the bonds were properly withheld from the trustee in bankruptcy, an issue on which substantial evidence tending to show appellant's guilt was offered at trial. Again our review of the record does not suggest any constitutional or other denial of a legally protected right. Substantial evidence was offered by the prosecution upon which a jury could find beyond a reasonable doubt that Engle committed the offenses charged.[2] We turn to appellant's contention that he was twice placed in jeopardy for the "same offense." [3]

The appellant contends that the Double Jeopardy Clause of the Fifth Amendment prohibits the Government from twice prosecuting him for interstate transportation of fraudulently acquired property since the property alleged to have been transported in both instances was essentially the same.[4] Engle suggests that the 1965 transportations of the bonds was part of a continuing crim-

---

2. See United States v. Gaines, 353 F.2d 276 (6th Cir. 1965), for the appropriate standard to be applied in assessing such claims.

3. Appellant focuses his Fifth Amendment double jeopardy claim on the transportation count of the indictment brought pursuant to 18 U.S.C. § 2314, one of the statutes invoked against him in the 1959 indictment. He claims as well that the other two counts of the indictment were "tainted" by the fact that he was twice

placed in jeopardy for the transportation offense. Since we reject his contention regarding the Section 2314 count, we do not reach his "taint" theory regarding the other two counts.

4. Actually, the bonds involved were not always the same, as part of the "scheme" involved denominational exchanges. We do not find that this factor changes the posture of the legal issues involved in the case.

inal episode which was the subject of the 1959 prosecution and must therefore be considered a part of the "same offense" as that term is used in the Fifth Amendment.[5] He makes this claim even though the criminal activity which was the subject of the 1965 indictment occurred approximately six years *after his first conviction* and could not possibly have been joined in the earlier proceedings.

At the outset it should be noted that the Double Jeopardy Clause has been the subject of special scrutiny in recent years both on the part of courts and commentators. The importance of the fundamental guarantee afforded by this provision of the Bill of Rights has been recently emphasized by the Supreme Court in several major decisions. Of paramount significance is Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), where the Court held the Double Jeopardy Clause applicable to the States, thereby overruling Palko v. Connecticut, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937). In Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), the Court gave further content to the mandate of the clause by holding that the Fifth Amendment guarantee against double jeopardy embodies collateral estoppel as a constitutional requirement.[6] The scope and meaning of the clause have evoked wide comment and examination by legal scholars.[7]

There is general agreement that the Constitution's double jeopardy clause embodies "three separate constitutional protections." It proscribes a "second prosecution for the same offense after acquittal . . .; a second prosecution for the same offense after conviction . . . ; [and] multiple punishments for the same offense." North Carolina v. Pearce, *supra*, 395 U.S. 717, 89 S.Ct. 2076.[8] The appellant seeks to invoke the second of these. Resolution of the question thus raised turns, of course, on the meaning to be ascribed to the phrase "same offense."

Although expressed in variable forms, the values which the Double Jeopardy Clause seeks to implement are well known and generally agreed upon.[9] The clause is essentially a rule of finality. It is intended to prevent vexatious piecemeal prosecution whether the result of an intent to harass, a desire to have more than one shot at obtaining a conviction or severe sentence, or mere prosecutorial caprice or carelessness. In Benton v. Maryland, *supra*, 395 U.S. pp. 795–796, 89 S.Ct. p. 2063 the Supreme Court reiterated its expression of the policy underlying the Double Jeopardy Clause, quoting Mr. Justice Black's statement in Green v. United States, *supra*, that "[t]he underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and

---

5. The Double Jeopardy Clause of the Fifth Amendment provides: " . . . nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . ."

6. See also North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2089, 23 L.Ed.2d 656 (1969) ; Price v. Georgia, 398 U.S. 323, 90 S.Ct. 1757, 26 L.Ed.2d 300 (1970) ; United States v. Jorn, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971) ; and Simpson v. Florida, 403 U.S. 384, 91 S.Ct. 1801, 29 L.Ed.2d 549 (1971) for other recent significant Supreme Court decisions in this area.

7. Having special merit are J. Sigler, Double Jeopardy, (1969) and Note, Twice in Jeopardy, 75 Yale L.J. 262 (1965). See also, Mayers and Yarbrough, Bis Vexari: New Trials and Successive Prosecutions, 74 Harv.L.Rev. 1 (1960).

8. See also, Note, Twice in Jeopardy, *supra*, pp. 265–266.

9. See Green v. United States, 355 U.S. 184, 187–188, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957), Note, Twice in Jeopardy, *supra*, pp. 266–267 and 277–279.

insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." Notwithstanding general agreement as to policy, the nature and scope of the rule actually applied has often varied. Such inconsistent application led one commentator to state more than thirty years ago: "The riddle of double jeopardy stands out today as one of the most commonly recognized yet most commonly misunderstood maxims in the law, the passage of time having served to burden it with confusion upon confusion."[10]   A source of profound confusion has been the use of the phrase "same offense" by the framers of the Constitution.[11]   Courts have not agreed as to the proper test to be applied to determine when a prosecution is based on the "same offense" as a prior prosecution and courts purporting to apply the same rule to similar facts have reached divergent results.

In attempting to give content to "same offense" most courts have applied in one form or another the "same evidence test" first enunciated nearly 175 years ago in Vandercomb's case.[12]   As early as 1932 in Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L. Ed. 306, the Supreme Court approved the test in a case involving a multiple count indictment. This court expressly approved it in the same context in Rutkowski v. United States, 149 F.2d 481 (6th Cir. 1945), and in Rayborn v. United States, 234 F.2d 368, 370 (6th Cir. 1956). The suggestion, sometimes advanced, that the Supreme Court rejected the test in cases involving multiple trials in In Re Nielsen, 131 U.S. 176, 9 S.Ct. 672, 33 L.Ed. 118 (1889), is not in accord with our interpretation of the court's opinion in that case. Indeed, Mr. Justice Bradley made it clear in his opinion in *Nielsen* that he was relying upon the well-established principle that an acquittal or conviction of a greater offense is a bar to a subsequent indictment for a minor offense included in the former, quoting Wharton's Treatise on Criminal Law. There was no discussion of either test which we consider here. On the other hand, the court has apparently never directly held it to be the required construction where multiple trials are involved.

In Ashe v. Swenson, *supra*, a case holding, as noted above, that collateral estoppel is an ingredient of the Fifth Amendment guarantee against double jeopardy, Mr. Justice Brennan's concurring opinion argues strongly for rejection of the "same evidence" test and substitution of the "same transaction" test to determine the identity of offenses where separate trials are involved. His concern about the validity of the "same evidence" test in this context is that "it does not enforce but virtually annuls the constitutional guarantee," for example, permitting separate trials or prosecutions where a single criminal episode involves several victims. Under the Brennan test in this situation the prosecution would be required to join all of the charges as to each victim in a single trial. It is conceded that "same transaction" is not self-defining and that an exception would be required where a crime is not completed or not discovered despite diligence on the part of police until after commencement of a prosecution for other crimes arising from the same transaction.

The "same transaction" test has now been adopted by the American Law Institute and, according to Justice Brennan's opinion, "England, too, has abandoned its surviving rules against joinder of charges and has adopted the 'same transaction' test." Justices Douglas and Marshall joined in Justice Brennan's concurrence but the other justices did not.

---

10.  Note, 24 Minn.L.Rev. 522 (1940).

11.  See Sigler, *supra*, pp. 63–69, Note, Twice in Jeopardy, *supra*, pp. 267, et seq. Sigler is the author of the most authoritative recent work in the double jeopardy field. Of the problem posed by this phrase he has said: "Confusion is rampant in this branch of double jeopardy law."

12.  The King v. Vandercomb and Abbott, 2 Leach 708, 720, 168 Eng.Rep. 455, 461 (1796).

Indeed, Mr. Justice Harlan in a separate concurring opinion expressly refused to commit himself to it and in his dissenting opinion Chief Justice Burger emphatically rejected it.

█ As the Supreme Court has not indicated that the "same evidence" test approved in *Blockburger, supra,* does not apply to separate trials as well as to several charges at the same trial, we feel compelled to apply that principle here. Rutkowski v. United States, *supra*; Rayborn v. United States, *supra*. On that basis it is clear that the evidence at Engle's second trial was materially different from the evidence at the first trial in 1959 and that the same evidence was not required to sustain both charges. The plea of double jeopardy is therefore not available to Engle.[13]

Affirmed.

13. Indeed on the facts before us it may well be that double jeopardy would be unavailable to appellant even by application of a "same transaction" test. As the course of criminal conduct and activity for which Engle was convicted in 1970 could not have been known or prosecuted in 1959, although concededly bearing some relationship to the 1958 conduct, the recognized exception to the joinder element of the "same transaction" test would appear to apply.